# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 138

### OCTOBER TERM, A.D. 2024

### December 20, 2024

EIDEN CONSTRUCTION, LLC, a
Wyoming limited liability company,

Appellant
(Defendant/Counter-Plaintiff),

v.

HOGAN & ASSOCIATES BUILDERS,
LLC, a Wyoming limited liability
company,

Appellee
(Plaintiff/Counter-Defendant).

HOGAN & ASSOCIATES BUILDERS,
LLC, a Wyoming limited liability
company,

Appellant
(Plaintiff/Counter-Defendant),

v.

EIDEN CONSTRUCTION, LLC, a
Wyoming limited liability company and
AMCO INSURANCE COMPANY, an
Iowa corporation,

Appellees
(Defendants/Counter-Plaintiffs).

S-24-0003, S-24-0004

*Appeal from the District Court of Uinta County*
The Honorable Richard L. Lavery, Judge

*Representing Appellant:*

      Nathan V. Graham, Bradley Arant Boult Cummings LLP, Houston, Texas.

*Representing Appellee:*

      Eric P. Lee and Matthew J. Pugh, Hoggan Lee Hutchinson, Park City, Utah. Argument by Mr. Lee.

***Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    Eiden Construction, LLC (Eiden) entered into an earthwork and utilities subcontract (Subcontract) with general contractor Hogan & Associates Builders, LLC (Hogan) on the Farson-Eden K-12 school construction project (Project). Hogan sued Eiden and its bonding company, AMCO Insurance Company (AMCO), for breach of contract to recover costs Hogan paid other contractors to complete Eiden's scope of work under the Subcontract, including, among other things, draining existing sewage lagoons and completing a fire pond. Eiden defended by arguing it was not responsible for draining the lagoons and Hogan did not comply with the notice and opportunity to cure provision of the Subcontract. Eiden also filed a counterclaim asserting Hogan owed it money for work it performed on the Project. AMCO asserted it was not responsible under the performance bond because Eiden did not breach the Subcontract and Hogan did not provide AMCO proper notice of its claims.

[¶2]    After a bench trial, the district court found for Hogan on its claim against Eiden for not draining the sewage lagoons but not on its claims regarding the fire pond or other work within Eiden's scope under the Subcontract. The court also ruled AMCO was not liable under the bond because Hogan did not prove most of its claims against Eiden and did not provide notice to AMCO of Eiden's failure to drain the sewage lagoons.

[¶3]    Eiden and Hogan appealed. In general, Eiden claims the district court erred by finding it in breach of contract for failing to drain the sewage lagoons, and Hogan claims the district court erred by concluding it was not entitled to recover damages from Eiden and AMCO on its other claims. Hogan also challenges the district court's calculation of prejudgment interest.

[¶4]    We affirm.

## ISSUES

[¶5]    We restate the issues dispositive to Eiden's appeal in S-24-0003 as:

1.  Did the district court properly rule Eiden breached the Subcontract when it refused to drain the sewage lagoons by pumping the effluent and hauling it offsite for disposal?

2.  Did the district court correctly determine Hogan was entitled to recover costs billed to the Utah office of another Hogan entity?[1]

---

[1] Eiden also raises an issue about the district court's decision on attorney fees. It asserts that, if we decide in Eiden's favor on its other issues, the final judgment "will be a net balance in Eiden's favor," which will make it the prevailing party. In that case, Eiden requests that we remand the case to the district court for

1

We restate the issues dispositive of Hogan's appeal in S-24-0004 as:

1.  Did the district court err by concluding Hogan was not entitled to recover its costs to complete the fire pond and other work included in Eiden's scope of work in the Subcontract because a) Hogan did not prove Eiden breached its responsibilities under the notice of default and cure provision of the Subcontract; and b) Hogan did not establish it was entitled to recover for common law breach of contract?[2]

2.  Did the district court err by concluding Hogan was not entitled to recover its costs for purchasing and installing the fire pond liner?

3.  Did the district court err by concluding AMCO was not liable under the performance bond for Eiden's failure to complete the work in the Subcontract?

4.  Did the district court correctly calculate prejudgment interest on Hogan's award after offsetting the amount it owed Eiden?

## FACTS

### *The Project and Contracts*

[¶6]  In January 2016, Sweetwater County School District No. 1 (School District) entered into a $19.6 million general contract with Hogan to construct a new Farson-Eden K-12 school and teacher residences. The new buildings were to be built adjacent to an existing school and teacher residences. The date for substantial completion of the entire Project was August 31, 2017. Substantial completion was defined in the general contract as "[t]he time at which the [w]ork [on the Project] has progressed to the point . . . the [w]ork is sufficiently complete [so that it] can be utilized for the purposes for which it is intended." Under the terms of the general contract, the parties intended for the Project to be finished so the School District could start school in the new building in August 2017.

[¶7]  Eiden was an earthwork company managed by Galen and Dustin Eiden. As general contractor on the Project, Hogan accepted Eiden's bid to perform the earth and utilities work on the Project. On January 21, 2016, Hogan and Eiden entered into a $1.17 million Subcontract which defined the scope of Eiden's work and incorporated other documents

_____

recalculation of the attorney fees award. Because we affirm the district court in all respects, we will not address this issue.

[2] Hogan also raises an issue as to whether the district court erred by concluding Hogan did not prove its damages for the cost to complete the fire pond and other work in Eiden's scope of work with reasonable certainty. Because we affirm the district court's conclusion that Hogan was not entitled to those damages, we will not address this issue.

associated with the Project, including, as relevant here, the general contract, Project specifications, and architectural drawings. Section 4.2 of the Subcontract included a change order process Hogan could use during construction to alter Eiden's contractual responsibilities. Through the change order process, Eiden's total work under the Subcontract increased to $1.2 million. AMCO issued a performance bond guaranteeing Eiden's work.

[¶8] Although the extent of Eiden's scope of work under the Subcontract is disputed in this case, Eiden was generally tasked with performing site earthwork, completing a new septic system, reclaiming the existing sewage system, and constructing a fire pond. The existing sewage system included two "wet" sewage lagoons and one "dry" percolation lagoon.[3] When Eiden finished construction of the new septic system and it passed inspection by the Project engineer and the Wyoming Department of Environmental Quality (DEQ), sewage from the school was to be rerouted from the sewage lagoons to the new septic system. After the new septic system was in use and accepting all waste from the school and teacher residences, the existing sewage lagoons had to be drained. DEQ issued a permit to the School District prescribing the process for draining the effluent (liquid waste) out of the "wet" lagoons into the percolation lagoon. The permit required a carefully timed process which allowed only 10,000 gallons of effluent to be pumped into the percolation lagoon each day. After the effluent was drained, the "sludge" (solid waste) remaining in the lagoons would then be allowed to dry and the dried waste would be trucked offsite for disposal.

[¶9] Eiden was tasked with building a fire pond for the new school in the same location as the sewage lagoons. The fire pond was necessary to ensure there was sufficient water on hand to fight a fire on the school grounds. Sweetwater County authorities and the fire marshal required the fire pond to be completed before the new school could be occupied, i.e., the fire pond had to be in place before the school could be considered substantially complete.

[¶10] The Subcontract emphasized Eiden's responsibility to meet the Project deadlines. For example, Eiden agreed to "commence, continue and complete its performance of the Work so as not to delay [Hogan], [the School District], or other contractors or subcontractors so as to insure timely completion of the prime [general] contract." Eiden was also required under § 2.2 of the Subcontract to "furnish sufficient forces to assure proper performance of its Work under this Agreement in strict compliance with all [Project] schedules . . . as may be required or provided by [Hogan]. At the request of [Hogan], [Eiden] shall provide a schedule of its Work under this Agreement showing timely completion."

---

[3] The parties and the district court used the terms "lagoon," "pond," and "pit" interchangeably.

[¶11]   Under § 8.2 of the Subcontract, Hogan could give Eiden a written "notice to cure" "any default" in Eiden's performance.  Section 8.3 governed Hogan's right to terminate Eiden's contract.  The Subcontract also included a provision which stated, "[i]n any action . . . to enforce the provisions of [the Subcontract], the prevailing party shall be entitled to an award of its reasonable attorney[] fees and costs."

*The Construction*

[¶12]   The Project got off to a slow start.  Within two weeks of receiving a notice from Hogan to proceed with the construction, Eiden presented submittal packets to Hogan seeking approval of materials it proposed to use for the Project.  However, Hogan delayed for over two months in approving Eiden's submittals.  At the time, Eiden complained that Hogan was delaying work on the Project.

[¶13]   In early February 2016, Hogan's Project Manager, Jeff Young, provided a preliminary site work schedule to Eiden, showing a May 27, 2016, deadline for completion of the septic system.  Hogan later revised the site schedule to extend the septic system deadline to September 22, 2016.

[¶14]   On April 12, 2016, Dustin Eiden sent a letter to Hogan regarding "existing sewer pond reclamation."  Mr. Eiden stated that he intended in the letter to "lay out step by step how we are going to approach the scope of work."  The plan included five steps:

- Step one was for Eiden to install the new septic system.  After the system was "completed and tested[,]" it would "become the new operation of the sewer system for the existing and new school[s]."
  Mr. Eiden noted that, under the permit, DEQ had "60 days to address the project.  At which time they [could] begin testing and inspecting the ponds [to] pump the liquid and sludge out."
- Step two was to divert all sewage flowing into the lagoons to the new septic system.
- Step three was to pump the effluent from the existing lagoons into the percolation lagoon.  Once the pumping was complete, "the standing water and sludge in all [three lagoons would] have to be dried out before [Eiden could] remove [it]."  Mr. Eiden cautioned that the drying process "could take up to weeks depending on [the] time of year we start it."
- Step four was to remove the dried sludge "to an appropriate facility" so DEQ could "do [its] testing."
- Step five was "[o]nce the [lagoons were] cleaned out and signed off by DEQ, [Eiden could] reclaim the pits and grade out per plan."

4

[¶15]  Mr. Eiden's April 12, 2016, letter emphasized it was important to move the process forward expeditiously and queried why the testing of the ponds could not begin prior to completion of the septic system.  He also warned that failure to move forward in accordance with his suggestions could delay the Project or result in additional costs.  In that regard, he specifically noted Eiden could not "continue with some scopes of work," including building the fire pond, until the lagoons were reclaimed.

[¶16]  The septic system was not finished by the September 22, 2016, deadline.  The Project engineer provided a "punch list" to Hogan and Eiden on October 5, 2016.  The punch list identified deficiencies in the septic system that needed correction before DEQ could inspect it.  A site schedule prepared by Mr. Young on November 8, 2016, showed the septic system as past due, and the OAC (Owner, Architect, and Contractor) meeting minutes included discussions about the need for Eiden to finish the septic system.  Over the next few months, Hogan repeatedly directed Eiden to correct the problems with the septic system so the Project engineer could approve the system and DEQ could inspect it.

### First Notice to Cure — Septic System Deficiencies

[¶17]  On February 13, 2017, Hogan sent Eiden a formal notice to cure, which stated Eiden was "seriously deficient in maintaining the schedule of its scope of work" and listed two deficiencies from the septic system punch list that still needed to be addressed — "12" HDPE cleanout and cap" and "installation of correct electrical panel per drawings/specifications[.]"  The notice to cure stated the "architect/owner/engineer [would] not submit the septic system for final DEQ approval until these items [had] been completed in their entirety."  It also directed Eiden to "respond with a detail of how you are going to meet the [P]roject schedule and make up for the time lost."  Hogan also sent this notice to AMCO.

[¶18]  The following day, Eiden sent a letter to Hogan setting out its plan to rectify the specifically identified deficiencies in the septic system.  Eiden remedied the septic system deficiencies in mid-March 2017, and the system was finally put into use on May 25, 2017, after DEQ approved it.  However, Eiden never provided a detailed plan to "make up for the time lost" due to the late completion of the septic system in order to "meet the project schedule."

### Second Notice to Cure — Drain Lagoons

[¶19]  Work continued on the site and school building throughout the spring and summer of 2017.  Shortly after the septic system began operating in May, Mr. Young emailed Eiden stating it needed to start draining and reclaiming the lagoons "ASAP to be able to get the fire pond in on time."  Eiden did not respond satisfactorily to the email, so on Thursday,

5

June 15, 2017, Hogan sent Eiden a second notice to cure.[4] The notice and associated correspondence stated the OAC had determined the lagoons could not be drained through the strictly regulated percolation process in the DEQ permit because it would not allow time for Eiden to reclaim the lagoons and build the fire pond prior to the school opening in August 2017. Hogan informed Eiden the lagoons would need to be drained by pumping the effluent into trucks and hauling it offsite for disposal. Hogan said it "would much rather this work be done on [Eiden's] end, but please be advised that if nothing has happened by Monday [June 19, 2017] with this, Hogan will be forced to supplement your work, in order to make sure it is completed in a timely manner to keep the Project rolling. Per contract, this work will be deducted from your contract amount." This notice to cure was not sent to AMCO.

[¶20] In the succeeding days, Hogan and Eiden corresponded about the June 15, 2017, notice to cure. Hogan attributed the need to expedite removal of the waste to Eiden's delay in finishing the septic system. On June 20, 2017, Galen Eiden officially responded to Hogan's notice to cure in an email which stated draining the lagoons was not in Eiden's scope of work and Eiden would not comply with Hogan's direction to drain the lagoons through pumping and offsite disposal. Mr. Eiden wrote: "Eiden[] Construction is contractually obligated to perform [the] scope presented in [the plans supplied at bid time]. . . . The scope of the reclamation of ponds, at time of bid, was presented **ONLY** in page C5.3 of [the] plan set," and that page made the School District responsible for draining the lagoons. (emphasis in original). He also objected to the OAC's decision to change the means and method for draining the lagoons from discharging the effluent into the percolation lagoon to pumping and hauling it away for offsite disposal. He said Eiden would "not be responsible for accepting these [disposal] cost[s] without" going through the change order process.

[¶21] Hogan did not initiate a change order, and Eiden did not perform the tasks set out in the second notice to cure. Consequently, Hogan paid approximately $240,000 to other subcontractors to pump the effluent out of the lagoons and haul it offsite for disposal. After the lagoons were drained, Eiden worked on reclaiming the lagoons and constructing the fire pond.

### Third Notice to Cure – Fire Pond and Other Items

[¶22] On August 2, 2017, Mr. Young emailed Eiden asking for an update and expected completion dates on the fire pond and other tasks in Eiden's scope of work. Eiden did not provide the requested update, and approximately a week later Mr. Young and Galen Eiden had a heated conversation about Eiden's work on the Project, including Mr. Young's belief

---

[4] Hogan's June 15, 2017, letter was not titled as a notice to cure or notice of default. However, the district court determined in pretrial proceedings that it qualified as a notice to cure, and Eiden does not argue on appeal that ruling was incorrect.

that Eiden was not supplying adequate manpower or equipment to finish on time. On August 10, 2017, Hogan sent Eiden a third notice of default/notice to cure, listing several tasks that were behind schedule and needed to be completed so a temporary certificate of occupancy (TCO) could be obtained from government officials by Monday, August 14, 2017, to allow the School District to occupy the school.[5] Hogan directed Eiden to: 1) "prep[] the sidewalk areas necessary to provide egress from the building"; 2) cut[] to grade "the access road to the south and east sides of the building" and ready the road "for the asphalt subcontractor to install road base"; (3) "complete the water tie-ins to all of the teacher residences," and (4) "complete the fire pond, as well as all other unfinished work, . . . to meet the schedule, including, but not limited to, getting a [TCO] by Monday, August 14, 2017." It stated Eiden was in default and "[u]nless the default[s] [were] cured within 3 days of the date of this letter, Hogan [would] be forced to proceed and supplement Eiden's work with other forces."

[¶23] Following the notice to cure, Eiden sent Hogan a letter describing its work on the specifically identified tasks and other tasks within its scope of work under the Subcontract. Items one through three from the notice of default were completed and are not at issue in this appeal. Eiden did not, however, complete the fire pond by August 14, 2017. In fact, it was obvious for some time the fire pond would not be completed in time to obtain a TCO so the school could open. Hogan obtained permission from the fire marshal to use an above-ground water storage tank as a temporary fire pond to obtain the TCO and allow the School District to start the school year on time. Hogan rented the tank from an outside subcontractor for $8,340.

### *Supplemental Work — Longhorn and Hogan Employees*

[¶24] Hogan hired Longhorn Construction to supplement Eiden's and other subcontractors' work on the Project. Longhorn began work on the Project on either August 9 or 10, 2017, and continued until April 2018. Longhorn worked on the fire pond during the late summer and fall of 2017. Hogan claimed it paid Longhorn a total of $836,961.59 to finish Eiden's entire scope of work, of which the fire pond cost $87,157.50. Hogan acknowledged Longhorn also did $116,135.67 worth of work on the Project that was not

---

[5] Mr. Young testified the TCO was issued when "the authorities having jurisdiction, the fire marshal, the inspectors . . . sign[ed]-off that the [S]chool [D]istrict [was] able to conduct business as usual in those areas." Using Mr. Young's definition, the standard for obtaining a TCO from government officials is similar to the contractual concept of "substantial completion." Under the general contract's definition of substantial completion, the school building would be considered substantially complete when the work had "progressed to the point" it could be "utilized for the purposes for which it is intended," which is akin to the TCO requirement that the building was suitable for the School District to "conduct business as usual." The original substantial completion date for the school building was May 26, 2017, meaning Hogan and the School District intended for construction on the building to be complete to the point it could be used as a school by that date. That would also generally mean the building would be in a condition to qualify for a TCO.

7

included in Eiden's scope of work. Additionally, Hogan claimed it used its own workers to supplement Eiden's work at a cost of $305,940.

[¶25] Eiden continued to work on the Project, including the fire pond, until October 4, 2017, when it temporarily stopped work while waiting for other contractors to finish their work and move out of Eiden's way. Galen Eiden testified Eiden intended to complete the work under its Subcontract when the circumstances allowed. However, in mid-October, one of Hogan's principals, Mike Hogan, asked Eiden to remove its equipment from the site, which Eiden did. Hogan did not formally terminate Eiden's contract or issue it another notice to cure after the August 10 notice.

### Court Proceedings

[¶26] Hogan filed suit against Eiden and AMCO on December 4, 2018, claiming Eiden breached the Subcontract by failing to meet the Project deadlines. Eiden filed an answer generally denying Hogan's assertions and counterclaimed seeking payment for its work on the Project. AMCO aligned with Eiden and claimed Hogan did not have a valid claim under the bond.

### Summary Judgment Motions

[¶27] The parties engaged in significant summary judgment motion practice, and some of the court's rulings were important to its eventual judgment after trial. Eiden filed a motion for partial summary judgment, seeking rulings that 1) Hogan's claim for breach of contract was limited to the specifically listed defaults in the August 2017 notice to cure; and 2) as a matter of law, Hogan could not establish its damages to a reasonable degree of certainty.

[¶28] In response to Eiden's assertion that Hogan's claims should be limited to the deficiencies specifically noted in its August notice to cure, Hogan claimed it presented three notices to cure to Eiden — in February, June, and August 2017. It stated that, although the June notice was not titled as a notice of default or a notice to cure, it qualified as such. The district court agreed with Hogan that the June 15, 2017, notice met the contractual requirements.

[¶29] Hogan also argued the February and August notices should be interpreted as notices to cure with respect to all of Eiden's issues with meeting the Project schedule, not just the specifically listed deficiencies. For the February notice, Hogan pointed to the language declaring Eiden was "seriously deficient in maintaining the schedule of its scope of work" and directing Eiden to "respond with a detail of how you are going to meet the project schedule and make up for the time lost." Hogan also claimed the language in the August notice—which referred to Eiden's "other unfinished work"—notified Eiden it was in default for failing to meet the Project schedule for its entire scope of work. The court partially granted Eiden's motion for summary judgment, ruling the February and August

notices to cure only provided notice of default for the specifically listed items. The court said those notices did "not declare or provide fair notice Eiden [was] considered in default and subject to Hogan's exercise of contractual remedies, such as supplementation of the work, for its entire scope of work." It denied Eiden summary judgment on the damages issue, concluding there were genuine questions of material fact as to whether Hogan's proof of damages met the reasonable certainty requirement.

[¶30]  AMCO filed a motion seeking a summary judgment on Hogan's claim under the performance bond because 1) Hogan did not give written notice it was terminating Eiden's Subcontract as required by the bond terms; and 2) Hogan did not comply with the bond and Subcontract requirements of written notice of default and an opportunity to cure. The court denied AMCO's summary judgment motion. On AMCO's first issue, the court concluded the plain language of the bond did not require Hogan to give written notice of its intent to terminate Eiden before Hogan could make a claim on the bond. As to AMCO's second issue, the court ruled AMCO did not show "as a matter of law that Hogan breached the terms of the bond by failing to provide notice and an opportunity to cure pursuant to the [S]ubcontract and the bond," so summary judgment was not appropriate.

### Bench Trial

[¶31]  The district court held a four-day bench trial on July 5-8, 2022. The court ruled Eiden breached the Subcontract when it refused to cure the June 15, 2017, default by draining the lagoons in a timely manner. It rejected Eiden's argument that draining the lagoons was not part of its scope of work, and concluded Eiden was obligated to drain the lagoons in accordance with the Project schedule. The court concluded that, although Eiden complied with the February 2017 notice of default by curing the specifically listed deficiencies in the septic system, it was "extraordinarily late" completing the septic system. As a result, Hogan justifiably determined in June 2017 there was insufficient time in the Project schedule to drain the lagoons through the percolation method and directed Eiden to pump the effluent and haul it away. Eiden was in breach of the Subcontract because it "expressly refuse[d] to commence and continue correction of the default, [i.e., drain the lagoons] either via the method or manner of performance proposed by [Hogan] to get caught up, or any other sufficient means and methods." The court concluded Hogan was entitled to supplement Eiden's work and charge the costs to Eiden under § 8.2 of the Subcontract, and awarded Hogan $240,927 for the amount it paid other subcontractors to drain the lagoons and dispose of the effluent. The district court also ordered Eiden to pay Hogan $8,340 for the costs of renting an above-ground water tank to act as a temporary fire pond, $9,901.02 for the costs of repairing an "incorrectly installed filter housing on the septic system," and $7,605 for retesting "incorrectly performed compaction work." The court calculated prejudgment interest separately for each awarded item.

[¶32]  However, the district court denied Hogan's claims for the amounts it paid its employees and Longhorn to finish Eiden's scope of work after the August 10, 2017, notice

to cure. Consistent with its earlier summary judgment ruling, the court only considered items in Eiden's scope of work that were identified as deficient in the August notice to cure. As to the fire pond, the court ruled Hogan was not entitled to recoup the amounts it paid Longhorn and Hogan employees to finish the fire pond because it did not prove Eiden breached the Subcontract. It found Eiden complied with the notice to cure by commencing and continuing satisfactory correction of the default, so Hogan was not entitled to supplement Eiden's work. The court also concluded Hogan did not prove most of its damages with reasonable certainty because it did not show a link between Eiden's scope of work and the amounts Hogan paid its employees and Longhorn. The district court also denied Hogan's claim against AMCO on the performance bond because 1) Eiden was not found liable on Hogan's claims related to the February and August defaults, and 2) AMCO was not liable on the June 15 default because Hogan did not send AMCO the notice to cure.

[¶33] With regard to Eiden's counterclaim seeking payment for work it performed on the Project, the district court accepted Hogan's evidence that it owed Eiden $158,654 but concluded the amount was unliquidated, so Eiden was not entitled to prejudgment interest. The court then ruled the amount Hogan owed Eiden would be "offset against the amounts awarded to Hogan from Eiden," which included prejudgment interest the district court had already calculated for each category of damages awarded, i.e., the costs of draining the sewage lagoons, renting the temporary fire pond/water tank, repairing the filter housing on the septic system, and retesting the compaction work. The district court's final judgment in favor of Hogan was $189,671.37. The court found that, because Hogan obtained a "substantial net recovery" against Eiden, Hogan was the prevailing party and, therefore, entitled to an award of attorney fees under the Subcontract. It ordered Hogan to submit a post-judgment affidavit for attorney fees under Wyoming Rule of Civil Procedure (W.R.C.P.) 54(d)(2).

[¶34] Both parties filed motions to amend the judgment and/or for relief from judgment under W.R.C.P. 59(e) and 60(a). Hogan claimed the district court overlooked its claim for reimbursement of its costs to purchase and install a fire pond liner that was originally part of Eiden's scope of work. Eiden claimed the court should amend the judgment because it improperly added prejudgment interest to the separate categories of Hogan's damages before offsetting the amount Hogan owed Eiden. Eiden also claimed it was entitled to an offset for the entire balance remaining on its Subcontract, $219,101.55, rather than the $158,654 it was owed for work it actually completed.

[¶35] The district court denied Hogan's motion. It concluded Hogan was not entitled to reimbursement of the costs to purchase and install the fire pond liner because "Hogan did not [prove] a breach of contract — that Eiden failed to cure." The court partially granted Eiden's post-judgment motion. It concluded it had incorrectly added prejudgment interest to each item of damages before applying Eiden's offset. Consequently, it recalculated the final judgment by offsetting the amount due Eiden from the principal amount due Hogan before determining the prejudgment interest, resulting in a reduced final judgment of

$141,199.32 in favor of Hogan. It denied Eiden's claim it was entitled to an offset for the remaining Subcontract balance.

[¶36] Finally, the district court reviewed Hogan's W.R.C.P. 54(d) motion seeking $392,211.50 in attorney fees and $14,277.25 in costs. *See* Rule 54(d) (setting forth procedures for attorney fees claims). The court applied the lodestar test for reasonableness of attorney fees and the discretionary factors listed in Wyo. Stat. Ann. § 1-14-126 (LexisNexis 2023); *see also Hensel v. DAPCPA RPO LLC,* 2023 WY 84, ¶ 26, 534 P.3d 460, 467 (Wyo. 2023) ("When considering the reasonableness of the fees requested, Wyoming courts apply the federal lodestar test, which requires a determination of (1) whether the fee charged represents the product of reasonable hours times a reasonable rate; and (2) whether other factors of discretionary application should be considered to adjust the fee either upward or downward.") (citations and quotation marks omitted). It awarded Hogan its requested costs but decided that, because of Hogan's limited success on its breach of contract claims, its attorney fees should be reduced by 25% to $294,083.63.

[¶37] Both sides appealed the district court's final orders. We will provide additional facts as necessary to the discussion of the individual issues.

## STANDARD OF REVIEW

[¶38] The district court conducted a bench trial, but neither party requested special findings of fact and conclusions of law under W.R.C.P. 52(a)(1)(A). *Morrison v. Hinson-Morrison,* 2024 WY 96, ¶ 20, 555 P.3d 944, 953 (Wyo. 2024). "When no such request is made, 'it shall not be necessary for the court to state its findings, except generally for the plaintiff or defendant,'" and we "consider that the trial court's judgment carries with it every finding of fact to support that judgment." *Id.* (quoting Rule 52(a)(1), and citing *Barney v. Barney*, 705 P.2d 342, 345 (Wyo. 1985), and *Bishop v. Bishop*, 944 P.2d 425, 428 (Wyo. 1997)).

[¶39] We review the court's factual findings as follows:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the

11

definite and firm conviction that a mistake has been committed.

*Denbury Onshore, LLC v. APMTG Helium LLC,* 2020 WY 146, ¶ 25, 476 P.3d 1098, 1105 (Wyo. 2020) (quoting *Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 31, 460 P.3d 230, 240 (Wyo. 2020), and *Ekberg v. Sharp*, 2003 WY 123, ¶ 10, 76 P.3d 1250, 1253 (Wyo. 2003)) (quotation marks omitted). "To the extent findings of fact are in question, we consider only the evidence of the successful party, ignore the evidence of the unsuccessful party, and grant the successful party every favorable inference that can fairly be drawn from the record." *Morrison,* ¶ 18, 555 P.3d at 953 (citing *Holland v. Holland,* 2001 WY 113, ¶ 8, 35 P.3d 409, 412 (Wyo. 2001)). "We review a district court's conclusions of law de novo on appeal." *Denbury Onshore, LLC,* ¶ 25, 476 P.3d at 1105 (citations omitted).

[¶40] Before we begin our discussion of the issues in this case, some explanation of the evidence is warranted. Eiden cites Exhibits 99 and B-6, but they are not included in the bench trial exhibit notebooks. These exhibits were not addressed at the trial and, thus, were not identified as trial exhibits by the court reporter. However, they were apparently stipulated into evidence at some point.

[¶41] At the end of the trial, the following colloquy took place between the attorneys for the parties and the district court judge:

> COURT: . . . We do need the exhibits.
>
> [Eiden's Attorney] MR. GRAHAM: Yes, that was a question we all had. There's several boxes of exhibits from both sides and —
>
> COURT: And we didn't have nearly as many exhibits that were actually used in the trial, but how many of them are stipulated to be —
>
> MR. GRAHAM: All of them. And, quite honestly, [Y]our Honor, it may be the case that either side may want to reference a document — you know, for example, we didn't — we didn't put up every single pay application, yet, they're relevant — you know what I mean? There are probably a lot of things that both parties either talked about or referenced in some way that may be useful to the Court in closing briefs (sic) that weren't necessarily displayed on the screen during the trial. And, you know, we do have the stipulated exhibits, so I'm not sure how the Court would prefer to handle that.

12

COURT: Well, we're still — the official record is paper. We're not to electronic filing yet, so we need paper exhibits.

MR. GRAHAM: And we have a paper copy for the Court's record.

COURT: Okay.

MR. GRAHAM: And — the question that I think we all had was — the logistical question, while this is the trial court, the clerk that all this stuff needs to be filed with is in Evanston, as I understand it.

COURT: Well, it actually would go with the Court Reporter.

MR. GRAHAM: I'm very, very sorry.
(Whereupon a discussion was had off the Record.)

COURT: So I would hang on to them myself, I guess. Well, if I had electronic copies, I don't need them. I mean —

MR. GRAHAM: We can do that, and then — I mean, if it's ultimately determined that we need to send paper copies to Evanston, we can ship them at any time.

[Hogan's Attorney] MR. LEE: Your Honor, we could — we can get them to the Court in Evanston. We're going right by — not tonight, but happy to — happy to be the mule for that if we can — I mean, I — what I see is a runner walking in the door with five or six boxes, and —

MR. GRAHAM: That's the only thing I was worried about, the Clerk looking at us going, what do you expect me to do with all of this.

COURT: It's not the first time that it's happened to them, but I think they — ultimately, they would have the record, and they would also, if there were an appeal, they would transmit the record to the Court . . . .

13

[¶42] The parties do not direct us to any place in the record that identifies or explains in full which exhibits were stipulated, the nature of the stipulation, or the extent to which the parties agreed the district court could rely upon them for its decision if the parties did not reference them at trial. Moreover, there is nothing in the record on appeal identifying the exhibits that were part of the official court record but were not trial exhibits. Given this unusual circumstance, we will specifically note in our discussion when we are considering exhibits not designated as trial exhibits and, if necessary, explain the consequence of not addressing them at trial.

## DISCUSSION

## I.  CONTRACT LAW

[¶43] Eiden and Hogan both challenge the district court's rulings on their respective contract claims. "To prove a breach of contract, the proponent must show 'a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages.'" *Larson*, ¶ 15, 421 P.3d at 544 (quoting *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), *as amended on reh'g* (Feb. 7, 2012)) (other citation omitted).

[¶44] To determine the parties' contractual obligations, the court must interpret the contact. "Contract interpretation presents questions of law which we review de novo." *Larson,* ¶ 16, 421 P.3d at 544 (citing *Pope v. Rosenberg*, 2015 WY 142, ¶ 21, 361 P.3d 824, 830 (Wyo. 2015)).

> The fundamental goal of contract interpretation is to determine the intent of the parties. *Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo. 2012). The "language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use." *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) (quoting *Moncrief v. Louisiana Land Exploration Co.*, 861 P.2d 516, 524 (Wyo. 1993)). This Court employs "common sense in interpreting contracts and ascribe[s] the words with a rational and reasonable intent." *Id.*, ¶ 22, 226 P.3d at 905. "When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). "In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Id.* (citation omitted).

14

*Id.,* ¶ 16, 421 P.3d at 544 (quoting *Pope,* ¶ 20, 361 P.3d at 830, and *Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 35, 351 P.3d 943, 953 (Wyo. 2015)) (some quotation marks omitted). "'Our rules of interpretation require that we interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning.'" *Id.,* ¶ 18, 421 P.3d at 544 (quoting *Pope*, ¶ 20, 361 P.3d at 830). "We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless." *Wallop*, ¶ 35, 351 P.3d at 953 (citing *Claman*, ¶ 28, 279 P.3d at 1013) (internal citations and quotation marks omitted).

## II.  EIDEN'S APPEAL — S-24-0003

[¶45]  In its first issue, Eiden claims the district court committed several legal and factual errors leading to an improper judgment against it for Hogan's costs to drain the sewage lagoons by pumping the effluent and hauling it offsite for disposal.  In its second issue, Eiden asserts the district court erred by awarding Hogan damages for costs billed to an associated company in Utah, Hogan & Associates Construction, Inc. (Hogan Utah).

### A.  The district court properly ruled Eiden breached the Subcontract by refusing to drain the sewage lagoons by pumping the effluent and hauling it offsite for disposal.

[¶46]  The district court determined Hogan was entitled to recover its costs to supplement Eiden's work under the Subcontract because Eiden refused to drain the lagoons in accordance with the June 15, 2017, notice of default.  The court ruled Hogan properly directed Eiden to drain the lagoons by pumping the effluent and hauling it offsite because Eiden's late completion of the septic system prevented it from draining the effluent through percolation.  Eiden claims the district court erred because 1) draining the lagoons was not in its scope of work under the Subcontract, and 2) even if it was responsible for draining the lagoons, Hogan breached the Subcontract by directing Eiden to pump the effluent and haul it offsite for disposal without following the contractual change order process.

#### 1.  *Eiden's Scope of Work*

[¶47]  The district court concluded Sheet C5.3 of the architectural drawings, titled "Lagoon Reclamation," was incorporated into Eiden's work under the Subcontract, and it required Eiden to drain the effluent from the sewage lagoons.  Eiden asserts it was not responsible under the Subcontract to drain or reclaim the sewage lagoons and "the obligations identified in Sheet C5.3 are not identified within Eiden's scope of work under the Subcontract."  It also claims the district court improperly used documents outside of the Subcontract to define Eiden's contractual responsibility even though it found the contract language was clear and unambiguous.

15

[¶48] Under § 1.3 of the Subcontract, the "Subcontract Documents" included the Subcontract, "the Owner-Contractor agreement [i.e., the general contract], general conditions, supplemental general conditions, instructions to bidders, specifications, drawings, addenda, change orders, field directives, clarifications, amendments and any pending and exercised alternatives." Section 1.1.1 of the Subcontract generally identified specifications applicable to Eiden's scope of work, including Section 2300—Earthwork. Mr. Young testified lagoon reclamation fell under Section 2300. Eiden claims lagoon reclamation was not included in Section 2300.

[¶49] The record before us does not include Section 2300. Eiden's Exhibit D-1 included some of the specifications but not Section 2300. Eiden claims, however, that Hogan's Exhibit 99 was also a copy of the specifications and included Section 2300. Although Exhibit 99 was not discussed at the bench trial or included with the trial exhibits, the district court mentioned Exhibit 99 in its decision. The court did not, however, state that Exhibit 99 included Section 2300 of the specifications, and the iteration of Exhibit 99 which is part of the record on appeal does not include Section 2300. In any event, the district court did not indicate it ever found a contractual provision which supported Mr. Young's statement that Section 2300 of the Project specifications included lagoon reclamation.

[¶50] Nevertheless, the district court determined the Subcontract specifically included architectural drawings, including Sheet C5.3. Sheet C5.3 showed the lagoon reclamation plan and included the following "Notes":

1. When the sewage is transferred to the new treatment system, the lagoon effluent shall be treated and tested. All testing results shall be submitted to the School District and architect.
2. When written approval is given by the School District's sewage treatment operator, the lagoon effluent is to be discharged into the percolation lagoon per the [DEQ permit].
3. All sludge is to be disposed of offsite at a permitted facility in accordance with all federal, state and local regulations. The Contractor shall provide to the owner and architect documentation of disposal from the permitted facility.
4. The sludge may be dried by adding and mixing soils.
5. Equipment shall not leave the lagoon area until properly cleaned and disinfected.
6. All soil contaminated with sludge is to be disposed of as sludge.

16

[¶51]   Eiden's current argument that the entirety of Sheet C5.3 was not part of its scope of work directly contradicts its position in the district court.  There, Eiden argued Sheet C5.3 partially defined its scope of work, but it was only obligated to do certain tasks identified therein and that did not include the task of draining the lagoons as set out in Note 2.  Galen Eiden testified he used Sheet C5.3, "Lagoon Reclamation," to prepare Eiden's bid because the sheet partially defined Eiden's scope of work under the Subcontract, and lagoon reclamation was included as a line item in its bid.  He acknowledged the lagoon reclamation part of his bid included some sludge removal and "[r]eclamation and regrading of pond areas to rough grade elevation."  Dustin Eiden testified Sheet C5.3 was "part of the contract documents" and included "a few notes about the reclamation of the ponds and grading scope."   Consistent with Galen's and Dustin's testimony, Eiden acknowledged in its closing argument that Sheet C5.3 was a "Subcontract Document" and defined "the scope for pond reclamation."  Given Eiden did not argue the whole of Sheet C5.3 was outside its contractual scope, we will not address that issue on appeal.  *See In re VS*, 2018 WY 119, ¶ 25, 429 P.3d 14, 21-22 (Wyo. 2018) (we generally do not address issues not made to the district court); *see also, In re ECH*, 2018 WY 83, ¶ 21, 423 P.3d 295, 302 (Wyo. 2018) (holding we will not address issues not raised below).

[¶52]   Eiden's primary argument regarding its scope of work, and the argument it made to the district court, is the plain language of Note 2 on Sheet C5.3 assigned the task of draining the effluent waste to the School District.  To reiterate, Note 2 required the lagoon effluent to be discharged into the percolation lagoon, in accordance with the DEQ permit, after "written approval [was] given by the School District's sewage treatment operator[.]"  Eiden claims the plain language of Note 2 incorporated the DEQ permit which prohibited anyone other than the School District, as the designated "permittee," from discharging the effluent.  Eiden points to language in the DEQ permit stating the permit was "issued to allow the [School District] to drain the lagoons" and authorized the School District to "discharge" from the "wet" sewage lagoons subject to the permit requirements.

[¶53]   The district court did not accept Eiden's interpretation of Note 2 and the DEQ permit, and neither do we.  Note 2 clearly stated the School District's role as holder of the DEQ permit was to give its "approval" to discharge the effluent into the percolation lagoon in accordance with the permit requirements.  The concept of giving "approval" for the discharge indicates there was another party that would seek approval and to whom approval would be given.  "Approval" is defined as "an act or instance of approving something." https://www.merriam-webster.com/dictionary/approval (last visited Nov. 2, 2024).  The definition of "approve" is "to give formal or official sanction"; "to ratify." https://www.merriam-webster.com/dictionary/approve (last visited Nov. 2, 2024). In *Frye Reg'l Med. Ctr., Inc. v. Hunt,* 510 S.E.2d 159, 163 (N.C. 1999), the North Carolina Supreme Court stated the definition of the word "approve" includes the concept of consenting to or ratifying "'some act or thing done by another.'" (quoting *Black's Law Dictionary* 102 (6th ed. 1990)).

17

[¶54] It would be inconsistent with the plain meaning of the Subcontract language and make no sense for the School District to give itself written approval to begin the discharge process. We use common sense to interpret contractual language with the goal of arriving at an interpretation which assigns a rational and reasonable intent to the parties. *Ultra Res., Inc.*, ¶ 22, 226 P.3d at 905. Moreover, as the district court recognized, there was nothing in Note 2 or the DEQ permit that prohibited the School District from directing or allowing another party to perform the physical task of draining the effluent, provided the School District gave its approval for the discharge and ensured the requirements in the permit were followed. Given Eiden's scope of work under the Subcontract included the duties set out in Sheet C5.3, the parties clearly intended for Eiden to perform the discharge outlined in Note 2 after obtaining written approval from the School District as holder of the DEQ permit.

[¶55] Eiden faults the district court for considering evidence outside the plain contractual language to interpret Note 2 as assigning the drainage task to Eiden. "When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Claman*, ¶ 26, 279 P.3d at 1013 (quoting *Hunter v. Reece,* 2011 WY 97, ¶ 17, 253 P.3d 479, 502 (Wyo. 2011)) (other citations omitted). A court may "resort to competent evidence of extraneous circumstances to determine the parties' intent" only when "the meaning of a provision in a contract is not readily apparent." *Principal Life Ins. Co. v. Summit Well Serv., Inc.,* 2002 WY 172, ¶ 19, 57 P.3d 1257, 1262 (Wyo. 2002).

[¶56] Without considering any extraneous evidence, the district court concluded Sheet C5.3 was unambiguous, the "plain text" of Note 2 established draining the effluent was part of lagoon reclamation, and "lagoon reclamation [was] within Eiden's scope of work." As such, the court's interpretation of Sheet C5.3 was properly limited to its four corners. It is true that later in the judgment the district court bolstered its interpretation of the plain language of Note 2 by referring to the parties' course of conduct and Dustin Eiden's April 2016 letter outlining the steps for reclaiming the lagoons. While it would have been improper for the court to use this extraneous evidence in its initial interpretation of the contract, the court's subsequent statement that the parties' conduct and Eiden's letter confirmed its earlier interpretation of the unambiguous language does not render that initial determination inappropriate.

[¶57] Eiden also seems to argue that even if Note 2 originally obligated it to drain the effluent, the School District's actions relieved Eiden of the responsibility of doing so. Eiden points to an email from the School District's designated sewage operator objecting to Eiden directly contacting DEQ to arrange for testing of the lagoons and insisting he was "the licensed operator" for the sewage system and would "be doing the discharging and monitoring." Eiden claims the operator's statements show the School District assumed the responsibility of draining the lagoons. While the sewage operator's statements could be read that way in isolation, Eiden fails to recognize that the next sentences in the operator's

18

email were: "I would like to be contacted FIRST about discharging from now on. The discharge permit must be adhered to." If the operator was the only person who could ever discharge the effluent into the percolation lagoon, he would not say he needed to be contacted first.

[¶58] Eiden also asserted that because the School District undertook some discharge of the ponds in 2016, it relieved Eiden of its responsibility under Sheet C5.3 to drain the effluent after the septic system was complete. The district court appropriately rejected Eiden's argument. As the district court recognized, the record does not show the School District's 2016 discharge amounted to an assumption of the responsibility in Sheet C5.3 "in light of the undisputed fact that that the ponds could not be pumped out until the septic [system] was complete and the ponds were no longer being used." Regardless of the School District's actions in 2016, it clearly was not undertaking the discharge required under Sheet C5.3. Eiden did not, therefore, demonstrate the School District took over the drainage responsibilities under Sheet C5.3. Furthermore, Eiden's arguments ignore that its Subcontract was with Hogan, not the School District. Changes to Eiden's scope of work under the Subcontract could only be made in writing by Hogan, not the School District.

[¶59] Finally, Eiden claims the School District never issued written authorization for Eiden to move forward with discharging the effluent as required by Note 2. Eiden claims the School District's approval was a condition precedent to its obligation to perform the task of discharging the effluent. Eiden does not direct us to any evidence showing it requested approval to begin the discharge after the septic system was operational or that, if it did, the School District refused to approve the discharge. To the contrary, Eiden insisted it was not responsible for draining the lagoons and flatly refused to do so. The district court properly determined draining the lagoons was in Eiden's scope of work and the School District's actions did not change that obligation.

### 2. *Eiden's Breach — Failure to Drain the Lagoons*

[¶60] On June 15, 2017, Hogan issued Eiden a notice of default/notice to cure under § 8.2 of the Subcontract for falling behind schedule draining the lagoons. Section 8.2 provides:

> 8.2  Notice to Cure.  If the Subcontractor fails within three (3) days after written notification to commence and continue satisfactory correction of any default with diligence and promptness, then the Contractor without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:
>
> 8.2.1  Supply workers, materials, equipment and facilities as the Contractor deems necessary for the completion of the Subcontract Work or any part which the Subcontractor has

19

failed to complete or perform after written notification, and charge the cost, including reasonable overhead, profit, attorneys' fees, costs and expenses to the Subcontractor; and/or

8.2.2 Contract with one or more contractors to perform such part of the Subcontract Work as the Contractor determines will provide the most expeditious completion of the Work, and charge the cost to the Subcontractor; and/or

8.2.3 Withhold any payment due or to become due the Subcontractor pending corrective action in amounts sufficient to cover losses and compel performance to the extent required by and to the satisfaction of the Contractor.

[¶61] Hogan's June 15, 2017, notice to cure stated Eiden was responsible for draining the lagoons and indicated Eiden was in default for failing to do so in a timely manner. The notice emphasized that draining the lagoons was a "high priority issue" that "need[ed] to be done as quickly as possible," which meant there was insufficient time to drain the lagoons through the percolation process set out in Sheet C5.3 and the DEQ permit. Accordingly, Hogan directed Eiden to pump the effluent from the lagoons and haul it offsite for disposal. Hogan provided Eiden contact information for companies that could accomplish those activities. Hogan said it "would much rather this work be done on [Eiden's] end, but please be advised that if nothing has happened by Monday [June 19, 2017], Hogan will be forced to supplement your work, in order to make sure it is completed in a timely manner to keep the [P]roject rolling." The goal of draining the lagoons by pumping and hauling the effluent to an offsite disposal facility was to bring the lagoon reclamation back on schedule so the fire pond could be finished prior to the Project's substantial completion deadline in August 2017. Hogan attributed the problems with the schedule to Eiden's late completion of the septic system.

[¶62] Eiden refused to undertake the task of draining the lagoons by pumping and offsite disposal. It claimed draining the lagoons was not in its scope of work and it was not responsible for the delayed schedule; therefore, it should not have to incur the cost of pumping the effluent and disposing of it offsite.

[¶63] The district court found Eiden breached the Subcontract by refusing to drain the sewage lagoons through pumping of the effluent and disposing of it offsite and Eiden's "extraordinarily late" completion of the septic system caused the need to expedite the drainage. To fully understand the court's rationale, we must review events predating the June 15 notice to cure.

[¶64] Under Hogan's Project site schedule, Eiden was supposed to finish the septic system by September 2016. It did not do so. In early October 2016, the Project engineer inspected

20

the septic system and created a "punch list," which included items that needed to be finished or corrected before DEQ could inspect and approve the system. Eiden delayed correcting the items on the punch list.

[¶65]  Hogan finally issued a notice to cure on February 13, 2017, which listed two specific deficiencies in the septic system. The notice also recognized Eiden's late completion of the septic system was causing problems with the Project schedule. Eiden cured the two specifically listed deficiencies by mid-March 2017, and the septic system was finally put into use on May 25, 2017, after DEQ approved it. Per Sheet C5.3, after the septic system was approved by DEQ and put into use, the effluent was to be pumped into the percolation lagoon at a maximum rate of 10,000 gallons per day. Eiden does not claim it attempted to drain the lagoons through percolation after DEQ approved the septic system in May 2017.

[¶66]  In early June 2017, Hogan directed Eiden to "come up with a game plan" for draining the lagoons "ASAP" so it could "get the fire pond in on time." Eiden failed to present a sufficient "game plan" to drain the lagoons, so Hogan issued the June 15, 2017, notice to cure. Hogan determined that, due to the late completion of the septic system which delayed draining the lagoons, there was insufficient time in the schedule to drain the effluent through the percolation process and still reclaim the lagoons and build the fire pond before the substantial completion deadline in August 2017. It therefore directed Eiden to expedite drainage of the lagoons by pumping the effluent and hauling it offsite for disposal. Eiden refused to drain the lagoons in accordance with Hogan's direction or by another means. As such, it did not cure the default.

[¶67]  Eiden presents several arguments to refute the district court's conclusion that, after Eiden was "extraordinarily late" finishing the septic system, Eiden breached the Subcontract by refusing to drain the sewage lagoons through pumping of the effluent and offsite disposal. First, Eiden claims Hogan admitted all the deficiencies associated with the February 2017 notice, including any delay caused by Eiden's late completion of the septic system, were cured. Second, Eiden claims it was not late finishing the septic system because it was functional in September 2016. Finally, Eiden argues factors other than its failure to finish the septic system punch list delayed the Project.

[¶68]  Eiden directs us to Exhibit B-6 to support its argument that Hogan admitted Eiden cured all problems related to the delayed completion of the septic system. Exhibit B-6 was Hogan's December 2017 Notice of Claim to AMCO on Eiden's performance bond.[6] In that notice, Hogan described Eiden's February 2017 default as its failure to complete the septic system punch list items and stated "Eiden eventually cured its February 2017 default." Hogan clearly did not intend the statement in Exhibit B-6 as a blanket admission

---

[6] Exhibit B-6 was not addressed through testimony at the trial, included as one of the trial exhibits by the court reporter, or cited by the district court in its decision. However, it was mentioned in Eiden's written closing statement and apparently stipulated into evidence as part of the unusual procedure described above.

21

that Eiden cured all the scheduling problems resulting from its late completion of the septic system. It simply stated that Eiden cured the septic system punch list items.

[¶69] Furthermore, in the summary judgment proceedings, the district court rejected Hogan's argument that the February 2017 notice to cure "should be interpreted as [a] notice[] to cure with respect to all the scheduling problems of the [P]roject." The court said the February 2017 notice to cure did "not declare or provide fair notice Eiden [was] considered in default and subject to Hogan's exercise of contractual remedies, such as supplementation of the work, for its entire scope of work." Since the February 2017 notice only applied to the specifically listed items, Hogan's "admission" that Eiden cured the February 2017 deficiencies is limited to those items. Thus, we do not agree with Eiden that, when Hogan said the specific punch list items in the February 2017 notice were cured, the late completion of the septic system could no longer be considered as contributing to Eiden's later breach of the Subcontract by failing to drain the lagoons in a timely fashion.

[¶70] In its second argument, Eiden asserts it was not late finishing the septic system. Galen Eiden testified the septic system was functionally complete in September 2016 and the punch list items were merely cosmetic. The district court rejected Mr. Eiden's characterization of the punch list items as cosmetic. It found that "until all punch list items were completed," DEQ could not be summoned to inspect the septic system and, after that, DEQ "had 60 days to approve the septic system, before draining of the ponds could be started." The district court's findings were not clearly erroneous. Eiden presented no evidence to support Galen's assertions that the punch list items were cosmetic or that the septic system was functional before the punch list items were completed. Eiden also did not present evidence refuting Hogan's position that the corrections were necessary before DEQ could be notified to inspect the system.

[¶71] Finally, Eiden argues Hogan did not prove Eiden was responsible for delaying the Project. It claims the real cause of the delay was Hogan's mismanagement of all aspects of the construction starting with its delayed approval of Eiden's first set of submittals and continuing to the point where the Project was in a "freefall" in 2017. Although the district court accepted Eiden's evidence that Hogan delayed approving Eiden's first set of submittals, Eiden does not explain how that delay early in 2016 contributed to Eiden's failure to finish the septic system on time. In fact, Mr. Young testified Hogan accounted for its delay in approving Eiden's submittals when it moved the deadline for completion of the septic system from the original date in May 2016 to September 2016. Moreover, Eiden's contention that Hogan's mismanagement of the Project caused the need to expedite the draining of the lagoons appears disingenuous in light of Eiden's refusal to make any effort to drain the lagoons by Hogan's method or another means.

[¶72] Eiden next asserts the Project was behind in many ways beside the septic system and lagoon drainage. It cites, as an example, a letter Hogan sent to 32 subcontractors in March 2017 regarding failures to meet the scheduled deadlines for the Project and Hogan's

concern about the School District charging liquidated damages for not meeting the general contract deadlines. The district court correctly rejected Eiden's argument regarding the other subcontractors. Eiden does not direct us to evidence showing other construction trades or subcontractors affected its ability to finish the septic system or drain the lagoons in accordance with its contractual obligations.

[¶73] Eiden also claims the district court erred by holding it responsible for draining the lagoons by pumping and hauling the effluent away because Jeff Young admitted in a June 2017 email the delay with the septic system was the Project engineer's or DEQ's fault. Mr. Young said in the email: "[W]ith the septic system taking as long as it did to get pas[sed] off by [the Project engineer], the need had arisen to haul the material off in order to be completed and have the fire pond ready in time for school. I am currently battling trying to get the [School] [D]istrict to understand that there was a three month delay between the time the septic system was approved and when we had the green light to begin pumping the pond out[.]"

[¶74] The district court correctly rejected Eiden's argument that Mr. Young's email indicated Eiden was not responsible for the need to expedite the lagoon drainage. The court accurately stated Eiden did not present evidence showing the Project engineer or DEQ caused any delay by failing "to comply with any contractual or regulatory deadlines." The court also pointed out that Mr. Young mistakenly stated there was a three-month period between when the engineer accepted the septic system in March and DEQ's approval of it in May. The court said: "[I]t ought to go without saying that May is two months after March, not three."

[¶75] As recognized by the district court, after Eiden corrected the septic system punch list items, the only impediment to draining the lagoons by percolation in accordance with Sheet C5.3 was DEQ's approval of the septic system, which was necessary before the waste could be rerouted to the septic system and the draining could begin. The fact it could take 60 days for DEQ to approve the system after it was passed off by the Project engineer was no surprise to Eiden as Dustin Eiden's April 12, 2016, letter expressly noted the 60-day period in setting out his plan for reclaiming the lagoons. The district court did not err by finding DEQ's delayed approval of the system was clearly due to Eiden's "extraordinarily late" completion of the septic system, which led to the need to expedite draining the lagoons so reclamation of the lagoons and construction of the fire pond could begin.

[¶76] Eiden also claims it provided expert evidence showing its delay in completing the septic system did not affect the overall Project schedule. Eiden's expert witness, Dan

23

Clark, conducted a "critical path" analysis and concluded Eiden did not delay Hogan's completion of the Project.[7]  The district court addressed this testimony as follows:

> Eiden also argues that Dan Clark's testimony and correspondence between the architect and Hogan establish that Eiden was not responsible for delaying completion of the Project as a whole.  The significance of this argument is unclear. There is documentary evidence and testimony that the Project was behind in several ways, including interior work.  And there is evidence the school district had threatened to impose liquidated damages or bus students to Rock Springs [if the school was not substantially complete, i.e., suitable for occupation, by the August deadline].  But Hogan is not seeking to recover such damages from Eiden.

(record cites omitted).  The district court correctly concluded the expert's testimony was not compelling because Hogan did not claim it was damaged by Eiden's delay of the entire project.

[¶77]  Finally, Eiden argues the district court ignored that Hogan admitted in November 2016 that Eiden's failure to finish the septic system punch list did not cause a delay.  It points to a statement Hogan made in an OAC meeting that, although Eiden was late turning over the septic system, "Eiden[] [was] not considered to be behind schedule as most of [its] work was originally to happen in spring 2017."  Clearly, Hogan's statement that Eiden was not behind schedule for most of its scope of work in November 2016 could not logically excuse Eiden's delay in finishing the septic system which continued into March 2017.

[¶78]  The evidence supports the district court findings and conclusions that Eiden's "extraordinarily late" completion of the septic system "impacted other parts of the work," including draining the lagoons.  The district court did not commit clear error when it concluded:  1) Eiden was in breach of contract for its failure to drain the lagoons in a timely fashion; 2) Eiden refused to cure the deficiency by draining the lagoons in accordance with Hogan's directions or any other means; and 3) Eiden's conduct caused Hogan to incur extra expenses to supplement Eiden's work by pumping the effluent and hauling it offsite for disposal.

### 3.    *Change of Means and Methods for Draining the Lagoons*

---

[7] Dan Clark explained the critical path methodology showed "who's doing what, when, how far along, and [whether], as you run it through the program, [those factors] impact. . . and extend. . . or prolong. . . the overall project duration critical path."

[¶79] Eiden asserts that even if it was responsible for draining the lagoons, it was only contractually obligated to fulfill the means and methods set out in the Project plans and specifications, which called for draining the lagoons by percolation. Therefore, according to Eiden, Hogan was required to follow the change order process to alter the terms of the Subcontract before Eiden was obligated to drain the lagoons by pumping the effluent and hauling it offsite for disposal. Section 4.2 of the Subcontract governed change orders and stated in part: "No alteration, addition, omission or change [could] be made in the Work or the method or manner of performance of the Work except upon written change order of Contractor."

[¶80] The district court rejected Eiden's argument that a change order was necessary before Eiden could be required to pump the effluent and haul it offsite for disposal. It ruled a change order was not required "if the subcontractor [was] in default and expressly refuse[d] to commence and continue correction of the default[.]"

[¶81] The district court was correct. Under the clear language of the Subcontract, the change order process in § 4.2 would apply if Hogan changed Eiden's scope of work under the Subcontract, including if Hogan changed the means and methods set out in the plans. Section 4.2 did not, however, govern the means or method of curing Eiden's default. Under § 8.2.1 of the Subcontract, when Eiden refused to correct the default after "written notification," Hogan was permitted to "[s]upply workers, materials, equipment and facilities" as it "deem[ed] necessary for the completion of the Subcontract Work" and charge the cost to Eiden. Section 8.2.2 allowed Hogan to "[c]ontract with one or more contractors [(supplemental contractors)] to perform such part of the Subcontract Work as [it] determine[d] [would] provide the most expeditious completion of the [Subcontract] Work, and charge the cost" to Eiden. The plain language of the Subcontract supposed that, after Eiden defaulted, a change in the means or method of accomplishing the Subcontract work might be necessary to "most expeditious[ly]" complete the work. The district court properly found that after Eiden defaulted on its contractual obligations by refusing to drain the lagoons to keep the Project on schedule, Hogan was entitled to reimbursement for what it paid supplemental contractors to expeditiously complete Eiden's work by pumping the effluent and hauling it offsite for disposal.

### B. Hogan was entitled to recover costs billed to Hogan Utah by supplemental contractors.

[¶82] In its second issue, Eiden argues the district court erred by requiring it to reimburse Hogan for amounts paid to supplemental contractors to complete Eiden's work under the Subcontract because the supplemental contractors sent their invoices to Hogan Utah rather than Hogan. Hogan Utah was a Utah construction company, and the shareholders of Hogan Utah formed Hogan to perform work in Wyoming. Hogan and Hogan Utah had common owners and consolidated their financial statements. The supplemental contractors that

25

assisted in draining the lagoons, provided a water tank for the temporary fire pond, and repaired a filter housing in the septic system all sent bills to Hogan Utah.

[¶83] Eiden claims Hogan could not recover costs billed to Hogan Utah because the companies were separate entities. Eiden argues Hogan "lack[ed] standing to recover for the alleged rights of Hogan Utah" and Hogan failed to prove it suffered the damages by paying for the supplemental contractors.

[¶84] Eiden's general assertion that Hogan and Hogan Utah should be treated as different entities is consistent with Wyoming law. For instance, in *Kloefkorn-Ballard Constr. & Dev., Inc. v. North Big Horn Hosp. Dist.*, 683 P.2d 656, 661 (Wyo. 1984), we recognized an out-of-state parent company was separate and distinct from its in-state subsidiary. *See also, Thompson v. Protective Ins. Co.,* 12-CV-148-F, 2013 WL 11834242, at * 3 (D. Wyo. April 24, 2013) ("A parent company is presumed to possess a legal existence separate and apart from that of its wholly owned subsidiaries."). However, the district court did not rule that Eiden was responsible for the bills because Hogan and Hogan Utah should be treated as a single entity. Instead, the court ruled that, even though the bills were sent to Hogan Utah, "Hogan [actually] incurred the project labor costs and expenses" and they were properly "tracked and accounted for as part of the overall organization of the corporate structures." Given there was no request for special findings of fact and conclusions of law under W.R.C.P. 52(a)(1)(A), we assume the district court's ruling "carries with it every finding of fact to support that judgment." *Morrison,* ¶ 20, 555 P.3d at 953.

[¶85] The record supports the district court's findings and conclusion. Even though the bills were addressed to Hogan Utah, the internal accounting system that serviced both Hogan Utah and Hogan ultimately charged the costs to Hogan and Hogan paid them. Mr. Young testified Hogan Utah's "home office" handled some of Hogan's administrative and accounting work, including charging the costs for the Farson-Eden Project to Hogan. Cris Hogan, who was the managing member of Hogan, testified that while Hogan Utah and Hogan consolidated their financial statements for some purposes, the job costs for the Farson-Eden School Project were tracked separately and charged to Hogan. Although the invoices from the supplemental contractors were sent to the Utah office, they all indicated, in some way, they pertained to the Farson-Eden Project. The record, therefore, supports the district court's finding that Hogan paid the supplemental contractor costs for which it sought reimbursement from Eiden.

[¶86] Nevertheless, Eiden claims Cris Hogan "admitted" the costs billed to Hogan Utah for work on the Farson-Eden Project were paid by Hogan Utah. This mischaracterizes Mr. Hogan's testimony, which was much more general. Mr. Hogan simply answered, "Yes" to the question, "[I]f you have job costs, those are billed to the — I would assume to the entity that incurs those job costs. Would that be correct?" We do not interpret Mr. Hogan's statement as an admission that the bills sent to Hogan Utah from the supplemental contractors but marked as applying to the Farson-Eden Project were paid by Hogan Utah.

26

He was answering a general question and was not at that point being asked specifically about the bills for supplementing Eiden's work. Mr. Hogan's testimony does not undermine the district court's finding that Hogan ultimately paid the costs charged to Eiden.

### III. HOGAN'S APPEAL — S-24-0004

[¶87] Hogan raises several issues in its appeal. First, it claims the district court erred when it determined Hogan did not prove Eiden breached the Subcontract by failing to complete its assigned tasks after the August 10, 2017, notice to cure. Next, Hogan challenges the district court's failure to award it the costs of purchasing and installing the fire pond liner. Third, Hogan claims the district court erred by concluding AMCO was not liable under the performance bond. Finally, Hogan claims the district court erred in calculating prejudgment interest.

#### A. The district court correctly concluded Eiden was not in breach of the Subcontract for failing to complete its contractual responsibilities after the August 10, 2017, notice to cure and properly rejected Hogan's common law breach of contract claims.

[¶88] Hogan claims the district court erred by denying its breach of contract claim against Eiden for reimbursement of the amounts Hogan paid supplemental contractors after the August 10, 2017, notice to cure. The notice stated Eiden was in default of the Subcontract and listed the following deficiencies: 1) "prepping the sidewalk areas necessary to provide egress from the building"; 2) cutting to grade "the access road to the south and east sides of the building" and having the road "ready for the asphalt subcontractor to install road base by Monday, August 14, 2017"; 3) completing "the water tie-ins to all of the teacher residences"; and 4) completing "the fire pond, as well as all other unfinished work, . . . including, but not limited to, getting a [TCO] by Monday, August 14, 2017." Hogan observed it was "apparent that Eiden[] lack[ed] the necessary manpower and equipment to meet the schedule[.]" The notice informed Eiden that unless "the default [was] cured within 3 days of the date of this letter, Hogan [would] be forced to proceed and supplement Eiden's work with other forces." Eiden responded to the notice to cure in an email on August 11, 2017. It confirmed Eiden would complete Hogan's "wish list by Monday . . .."

[¶89] Although Hogan's notice stated Eiden had three days to cure the listed items, Hogan directed Longhorn to begin work on the Project, including tasks in Eiden's scope of work, on either August 9 or 10, 2017. Longhorn continued to work on the Project until April 2018, and Hogan claimed it paid Longhorn $836,961 to complete Eiden's scope of work. Hogan also asserted it used its own workers to supplement Eiden's work, at a total cost of $305,940. Of that amount, $187,750 was for additional oversight by supervisory employees of work included in Eiden's scope and $118,190 was for "earthwork."

27

[¶90]  Eiden continued to work onsite until October 4, 2017, when it temporarily ceased working on the Project to give other contractors time to finish their tasks and move out of the way so Eiden could complete its scope of work.  However, in mid-October, Mike Hogan directed Eiden to remove its equipment from the site.  Hogan did not issue Eiden another notice to cure after August 10, 2017, or formally terminate the Subcontract in accordance with § 8.3.[8]

[¶91]  Regarding the deficiencies mentioned in the August 10, 2017, notice to cure, the district court found Eiden completed "prepping" the sidewalk areas and its work on the access road by August 14, so Eiden was not in breach of the Subcontract as to items (1) and (2), above.  As to item (3), the water tie-in to the teacher residences, the district court found Eiden completed all but one of the tie-ins by August 14 and completed the last one by August 23.  The failure to complete one tie-in by August 14 apparently did not hinder the issuance of the TCO and Hogan did not claim it was entitled to any damages related to it.  The fire pond was not, however, completed by August 14, 2017.

### 1.    *Breach of Subcontract § 8.2 — Fire Pond*

[¶92]  The fire pond was critical for occupancy of the school, so Hogan arranged with the fire marshal to use an above-ground water storage tank as a temporary fire pond.  This allowed issuance of the TCO and school to start on time.  The district court held that, because Eiden did not complete the fire pond on time, Hogan was entitled to reimbursement "for the cost to rent an above-ground tank in order to obtain temporary occupancy, $8,340, plus prejudgment interest, $1.59 per day, for a total of $10,876.05."  Except for the prejudgment interest calculation, this aspect of the court's judgment is not challenged on appeal by any party.

---

[8] Section 8.3 of the Subcontract stated:

> In lieu of the provisions of paragraph 8.2, or after the provisions of paragraph 8.2 have been invoked but have not achieved results that are satisfactory to the Contractor, the Contractor may issue written notification to the Subcontractor and its surety, if any, stating that if the Subcontractor fails to commence and continue correction of a default within five (5) days of the written notification, the Agreement will be deemed terminated.  A written notice of termination shall be issued by the Contractor to the Subcontractor at the time the Subcontract is terminated.  The [C]ontractor may furnish those materials, equipment and/or employ such workers or subcontractors as the Contractor deems necessary to maintain the orderly progress of the Work.  All costs incurred by the Contractor in performing the Subcontract Work, including reasonable overhead, profit and attorneys' fees, costs and expenses, shall be deducted from any moneys due or to become due the Subcontractor.  The Subcontractor shall be liable for the payment of any amount by which such expenses may exceed the unpaid balance of the Subcontract Amount.

28

[¶93]   Hogan also claimed it was entitled to $87,157.50 from Eiden for the costs Hogan paid Longhorn to assist in completing the fire pond.  The district court rejected Hogan's claim.  It ruled Hogan did not prove Eiden failed to comply with its obligation under § 8.2 of the Subcontract to cure the fire pond deficiency.  As we explained above, § 8.2 of the Subcontract stated Eiden must "within three (3) days after [Hogan's] written notification . . . commence and continue satisfactory correction of any default with diligence and promptness[.]"  If Eiden failed to do so, Hogan had the right to supplement Eiden's work and charge the cost to Eiden.  The district court ruled § 8.2 of the Subcontract meant that, "[a]fter the occurrence of two conditions precedent, [including] providing a written notice of default and failure to commence and continue to cure, Hogan had the right to charge [Eiden] for supplemental work."

[¶94]   The court stated the plain language of § 8.2 did not require Eiden to entirely cure the deficiency, i.e., complete the fire pond, within three days after the notice.  It found Eiden commenced and continued satisfactory correction of the default (completion of the fire pond) with diligence and promptness throughout August and September 2017, so Eiden was not in default and Hogan could not recover the amounts it paid Longhorn to supplement Eiden's work.

[¶95]   The district court was correct that the clear language of § 8.2 did not require completion of a noticed deficiency within the three-day cure period.  Instead, Eiden was required to "commence and continue satisfactory correction of any default with diligence and promptness."   The plain meaning of "commence" is to "begin" or "start." https://www.merriam-webster.com/dictionary/commence (last visited Nov. 3,2024). "Continue" means "to maintain without interruption a . . . course[] or action." https://www.merriam-webster.com/dictionary/continue (last visited Nov. 3, 2024). "Diligence" is "steady, earnest, and energetic effort."  https://www.merriam-webster.com/dictionary/diligence (last visited Nov. 3, 2024).  In the context of this case, "prompt" means "perform[] readily or immediately."  https://www.merriam-webster.com/dictionary/prompt (last visited Nov. 3, 2024).  So, under the plain meaning of the terms used in § 8.2, Eiden was required, within three days after the notice, to readily or immediately begin and maintain actions and steady effort to satisfactorily correct the default.

[¶96]   If the parties intended § 8.2 to require Eiden to complete a deficient item within three days after Hogan gave notice, it would have been unnecessary to include the words "commence," "continue," "diligence," and "promptness."  The dictionary definitions of each of these terms describes a type or condition of ongoing activity.  Drafting a provision requiring satisfactory completion of a deficient item within three days would have been much simpler; the language just would have said Eiden was required to satisfactorily complete or correct the default within three days of Hogan's notice.  Our rules of interpretation require us to interpret the contract as a whole, read each provision in light of all the others, presume each contractual provision has a purpose, and avoid interpreting a

29

contract to render any provisions inconsistent or meaningless. *Wallop Canyon Ranch, LLC*, ¶ 35, 351 P.3d at 953; *Claman*, ¶ 28, 279 P.3d at 1013. To accept Hogan's interpretation of § 8.2, we would have to read the terms "commence," "continue," "diligence," and "promptness" out of § 8.2, which would violate these important rules of contract interpretation.

[¶97]   For Hogan to recover the amount it paid Longhorn to supplement Eiden's work on the fire pond, Hogan needed to present evidence showing Eiden's performance did not meet the contractual requirements of commencing and continuing satisfactory correction with diligence and promptness. These are, of course, relative terms and, thus, questions of fact. *See generally Kemp Bros. Constr., Inc. v. Titan Elec. Corp.,* Super.Ct.No. 05CC03442, 2011 WL 2238970, * 4 (Cal. Ct. App. 2011) (unpublished decision) (stating the determination of what actions the general contractor and subcontractor took with respect to a notice to cure, and "whether their actions satisfied contract terms, [were] questions of fact for the jury"). In *Minger Constr., Inc. v. Clark Farms, Ltd*., 873 N.W.2d 301, *2 (Iowa Ct. App. 2015) (unpublished table decision), the Iowa Court of Appeals interpreted contract language similar to that in the case at bar. The subcontract in *Minger Constr., Inc.* stated: "If the [s]ubcontractor fail[ed] within three (3) working days after receipt of the notice of default to commence and continue satisfactory correction of such default with diligence and promptness," the general contractor could exercise its contractual remedies. *Id.* The Iowa court of appeals held the determination of whether the subcontractor's actions met the cure requirements was a question of fact for the jury. *Id.*

[¶98]   The district court found, as a factual matter, "Hogan did not prove that Eiden failed to commence and continue performing its obligations to cure with respect to the fire pond or other work in the notice to cure." Under our standard of review and in the absence of special findings of fact and conclusions of law under W.R.C.P. 52(a)(1)(A), the district court's ruling carries with it every finding of fact necessary to support its conclusion. The evidence supports the district court's finding that Eiden complied with its contractual obligation to work toward satisfactory correction of the fire pond default. Galen Eiden testified his company consistently worked on the fire pond throughout August and September 2017. He also provided photographs to back up his testimony and show Eiden's conscientious effort. Eiden's work on the fire pond was, however, hindered by Longhorn's interference. Galen said Eiden had difficulty accessing the fire pond area because "Longhorn [was] all over the place running with every piece of equipment that was on-site. . . . [I]t was just hard. You just can't have two companies trying to do the same thing. It just don't work." The district court properly concluded Hogan was not entitled to recover Longhorn's costs for work on the fire pond because Eiden fulfilled its contractual responsibility for curing the default.

## 2.      *Breach — Common Law Contract Principles — Fire Pond*

[¶99] Hogan also claims the district court erroneously concluded the remedies specifically listed in § 8.2 of the Subcontract were exclusive. According to Hogan, it should have been allowed, under common law contract principles, to recover the amounts it paid Longhorn to finish the fire pond even though it did not comply with the notice and cure provision of the Subcontract. Hogan directs our attention to the language in § 8.2 which states, "the Contractor *without prejudice to any other rights or remedies,* shall have the right to any or all" of the three expressly stated remedies, including the right to bring in other contractors to supplement Eiden's work. (emphasis added). It claims the "other rights and remedies" referenced in § 8.2 include "common law" contract damages which "may include recovery for incidental or consequential loss caused by the breach, as long as such damages are a foreseeable result of the breach." *Legacy Builders, LLC v. Andrews,* 2014 WY 103, ¶ 36, 335 P.3d 1063, 1072 (Wyo. 2014). After all, "[c]ontract damages are intended to give the injured party the benefit of the bargain — to place the injured party in the same position he would have been in if the breach had never occurred." *Id.*, ¶ 17, 335 P.3d at 1068.

[¶100] We agree the clear language of § 8.2 states Hogan was not limited to the specifically listed remedies. However, while expanding the universe of remedies available to Hogan for Eiden's breach, the contractual language did not absolve Hogan of its responsibility to give Eiden notice and the opportunity to cure. Hogan's rights and remedies (whether specifically outlined in the contract or "other rights and remedies") were conditional. "*If* the Subcontractor fails within three (3) days after written notification to commence and continue satisfactory correction of any default with diligence and promptness, *then* the Contractor without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies . . . ." (emphasis added). In other words, the clear language of § 8.2 conditioned Hogan's right to *any* remedy on Hogan first giving Eiden notice and an opportunity to cure. *See generally Playmark Inc. v. Perret,* 268 A.3d 988, 1003-04 (Md. Ct. Spec. App. 2022) (describing an "employment agreement [which] explicitly conditioned payment on compliance with a post-employment covenant not to compete in an 'if, then' fashion" (citing *Stevenson v. Branch Banking & Trust Corp.*, 861 A.2d 735 (Md. Ct. Spec. App. 2004))); *Coffey v. Coffey,* 888 N.W.2d 805, 811 n.3 (S.D. 2016) (stating an "if-then" provision in a contract "sets forth a condition" "which triggers subsequent obligations" (i.e., *if* the home was sold before the mortgage was paid off, *then* the mortgage would "be paid first from the proceeds of the sale")).

[¶101] Hogan cites *City of Gillette v. Hladky Constr., Inc.,* 2008 WY 134, ¶ 48, 196 P.3d 184, 200 (Wyo. 2008), to support its position it was entitled to breach of contract damages even though it did not comply with § 8.2. *Hladky* recognized that we "adhere[] to the principle that remedies provided in a contract are generally not exclusive." *Id.* However, the context of this statement is important to understanding whether it supports Hogan's argument that it was entitled to damages even though it did not comply with § 8.2. Hladky entered into a general contract to remodel and expand the Gillette City Hall. *Id.,* ¶¶ 6-10, 196 P.3d at 191-92. The contract required the City to extend the project deadline if it delayed Hladky's performance under the contract. *Id.,* ¶ 44, 196 P.3d at 199. After the

City delayed Hladky by failing to approve a change order in a timely fashion, Hladky claimed the extended deadline did not fully compensate it for the City's delay and sought money damages. *Id.,* ¶¶ 37, 45, 196 P.3d at 198-200. We ruled that because the contract language did not expressly state extension of the project deadline was the exclusive remedy available to Hladky, it could also seek money damages. *Id.,* ¶¶ 48-50, 196 P.3d at 200-01.

[¶102] In *City of Gillette*, we did not, as Hogan seems to argue, ignore the express language of the contract in favor of "common law" contract principles. We evaluated the contract language to determine if it prohibited damages other than an extension of the contract deadlines and concluded it did not. *Id.,* ¶¶ 48-50, 196 P.3d at 200-01. Moreover, after addressing the City's argument about the availability of money damages, we considered the City's argument that Hladky failed to comply with its contractual obligation to give notice of its claim for money damages and concluded Hladky provided timely notice. *Id.,* ¶¶ 89-95, 196 P.3d at 208-09. Regardless of the fact Hladky was requesting damages outside of those expressly listed in the contract, it still had to comply with other contractual requirements to qualify for the damages, including giving proper notice of its claim. *Id.*

[¶103] Wyoming law is clear that contractual notice and cure provisions are enforceable. In *Crouch v. Cooper,* 2024 WY 98, ¶¶ 15-22, 556 P.3d 199, 205-06 (Wyo. 2024), the owners of leased farmland terminated the tenants' lease without providing proper notice of default or the opportunity to cure as required by the lease. The owners claimed they were not required to give the tenants notice and an opportunity to cure because the tenants had already materially breached the lease. *Id.,* ¶¶ 23-25, 556 P.3d 206-07. We rejected the owners' argument and stated that because the owners failed to give the tenants notice and an opportunity to cure the "material breach" before terminating the lease, the owners were in breach of the lease. "'When a party fails to provide notice of a material breach, if required by the terms of the lease, reliance on that breach [to justify termination of the lease] is improper.'" *Id.,* ¶ 24, 556 P.3d at 206-07 (quoting *Kinstler v. RTB S. Greeley, Ltd. LLC*, 2007 WY 98, ¶ 8, 160 P.3d 1125, 1128 (Wyo. 2007)).

[¶104] Applying the same principle here, Hogan was required to give Eiden an opportunity to cure its default of falling behind the Project schedule for completing the fire pond. Because it did not, Hogan could not rely on that breach to seek recompense for supplementing Eiden's work. There was nothing in *Crouch* that suggested the owners were entitled to disregard the notice and cure requirements in favor of some type of "common law" contract principles. In fact, the tenants were awarded damages for the costs they incurred when the owners terminated the lease without complying with the notice and cure provisions of the lease. *Id.,* ¶ 38, 556 P.3d at 210.

[¶105] Hogan also argues that, regardless of its failure to comply with the notice and cure requirements of the Subcontract, it was entitled to "common law" contract damages because Eiden did not complete its work by the August 31, 2017, deadline for substantial completion of the entire Project. While this argument may have merit in another case,

Hogan does not present any legal authority supporting its position that it was not required to comply with the notice and cure requirements in the Subcontract because Eiden breached the Subcontract by failing to meet the substantial completion deadline for the Project. We do not consider arguments which are not supported by cogent argument and citation to pertinent legal authority. *See Vassilopoulos v. Vassilopoulos,* 2024 WY 87, ¶ 28, 557 P.3d 725, 734 (Wyo. 2024) (citing *McInerney v. Kramer*, 2023 WY 108, ¶ 14, 537 P.3d 1146, 1150 (Wyo. 2023) (explaining that this Court does not address arguments unsupported by cogent argument or authority)).

[¶106] Furthermore, Hogan does not adequately explain how Eiden's failure to complete its contractual scope of work by the Project substantial completion deadline fits into Hogan's breach of contract claim. Hogan specifically stated it was not claiming damages from Eiden for delaying the entire Project, and the evidence showed Hogan did not obtain substantial completion of the Project until June 29, 2018. It is undisputed that Hogan's late completion of the Project was not solely attributable to Eiden; many of the tasks which were incomplete in August 2017 and eventually completed by Longhorn were assigned to other trades/subcontractors and, thus, outside Eiden's scope of work. Although the parties do not tell us whether the School District formally extended the August 2017 deadline, we know the School District did not assess liquidated damages against Hogan despite the fact it was nearly 10 months late finishing the Project. So, Hogan could not claim such damages from Eiden's failure to meet the substantial completion deadline.

[¶107] In these circumstances, where Hogan does not provide legal authority or evidence explaining how Eiden's failure to meet the August 31, 2017, substantial completion deadline disqualified Eiden from the opportunity to cure the fire pond default, we do not fault the district court for refusing to award Hogan damages under its "common law" breach of contract argument.

### 3. *Breach — Items Not Included in the August 10ᵗʰ Notice to Cure*

[¶108] Hogan also sought reimbursement for the amounts it paid Longhorn and Hogan's own employees to finish items it claimed were in Eiden's scope of work but not referenced in the August 10, 2017, notice to cure, such as the track and field and football facilities, parking areas, landscape and site grading work, relocation of an irrigation ditch, reclamation work, installation of drains, sewer and water lines, and hauling and placement of road base. These charges make up the majority of Hogan's $836,961.59 claim against Eiden for Longhorn's costs and, apparently, its $305,407 claim for its own employee costs.

[¶109] As we mentioned above, Eiden filed a motion for summary judgment prior to trial, requesting, in part, a ruling that under § 8.2 of the Subcontract, the August 2017 notice to cure was limited to the specifically stated items. Hogan argued that the August notice should be interpreted as applying to all parts of Eiden's scope of work that were behind

schedule, seemingly because the notice mentioned "all" of Eiden's "other unfinished work" and Eiden's lack of "manpower and equipment to meet the schedule."

[¶110] The district court partially granted summary judgment in Eiden's favor holding that, as to the August notice to cure, Hogan was only entitled to pursue damages for the items specifically listed. The court held the notice to cure did "not declare or provide fair notice [that] Eiden [was] considered in default and subject to Hogan's exercise of contractual remedies, such as supplementation of the work, for its entire scope of work." Although Hogan discusses its damages related to the non-noticed items, it does not expressly challenge the district court's summary judgment ruling that, for the items not listed in the August 2017 notice to cure, it failed to comply with § 8.2's notice requirement. In addition, to the extent Hogan is arguing it is entitled to recover damages for the non-noticed items under common law contract principles, we reject its position for the same reasons we rejected it on the fire pond.

[¶111] Although the district court rejected Hogan's contract claims because it did not prove Eiden breached the Subcontract, it also addressed Eiden's argument that Hogan did not prove its damages with reasonable certainty. Our affirmance of the district court on the breach element is dispositive. As a result, we will not address Hogan's damages issue.

### B. The district court properly determined Hogan was not entitled to recover the costs it incurred to purchase and install the fire pond liner.

[¶112] Eiden's scope of work on the fire pond included purchasing and installing a fire pond liner. However, after directing Eiden to leave the Project, "Hogan purchased a pond liner from ACF West, Inc., for $23,799, and hired HJ2 Liners, LLC, to install the pond liner at a cost of $13,775." Although Hogan argued it was entitled to reimbursement from Eiden for the pond liner costs, the district court did not address that aspect of Hogan's claim in its judgment. Consequently, Hogan filed a post-judgment motion under W.R.C.P. 59(e) and 60(a), stating the district court's failure to address the pond liner issue was an oversight and the judgment should be corrected by awarding Hogan the fire pond liner costs. The district court denied Hogan's post-judgment motion because, like with Hogan's other efforts to recover the costs it paid supplemental contractors to finish the fire pond, Hogan did not give Eiden a sufficient opportunity to cure the default before supplementing Eiden's work.

[¶113] In general, an order on a motion to alter or amend a judgment under Rule 59(e) is reviewed for an abuse of discretion, while a Rule 60(a) motion to correct a clerical mistake or an oversight or omission in a judgment is reviewed de novo. *Am. Collection Sys., Inc. v. Judkins,* 2024 WY 66, ¶ 16, 550 P.3d 549, 555 (Wyo. 2024) (holding a motion to alter or amend judgment under Rule 59(e) is reviewed for abuse of discretion); *Snyder v. Snyder,* 2021 WY 101, ¶ 13, 495 P.3d 876, 879 (Wyo. 2021) (explaining we review de novo the

34

application of a two-part test when considering a W.R.C.P. 60(a) ruling: 1) does the correction or clarification relate to one of the mistakes covered by W.R.C.P. 60(a); and, if so, 2) does the order clarify as opposed to modify the original judgment) (citations omitted).

[¶114] The district court neither abused its discretion nor committed an error of law when it ruled Hogan was not entitled to relief under Rule 59(e) or Rule 60(a) for the fire pond liner. As we explained above, Eiden complied with Hogan's August 10, 2017, notice to cure the fire pond default by commencing and continuing satisfactory correction of the default with promptness and diligence, and, therefore, had the right under the Subcontract to cure the default by purchasing and installing the fire pond liner. Hogan did not have the authority, under § 8.2, to supplement Eiden's work. The district court correctly ruled Hogan was not entitled to reimbursement for supplementing Eiden's work by purchasing and installing the fire pond liner.

### C. The district court did not err by concluding AMCO was not liable under the performance bond.

[¶115] AMCO, as Surety, issued a performance bond to Eiden, as Principal/Subcontractor, and Hogan, as Obligee. Under the bond terms, when "Principal [was] in default, . . . Obligee after reasonable notice to Surety [could] . . . arrange for the performance of Principal's obligation under the subcontract," and seek compensation as provided for in the bond. The district court concluded that, although Hogan sent the February and August 2017 notices to cure to AMCO, Hogan failed to send AMCO "[t]he June 15, 2017, notice to cure[.]" Consequently, the court ruled AMCO was not responsible for Eiden's failure to drain the lagoons by pumping the effluent and hauling it away as Hogan directed in the June notice to cure.

[¶116] Hogan claims, on appeal, that, because the district court found Eiden created the need for expedited disposal of the effluent by being "extraordinarily late" completing the septic system, the February 2017 default was never cured. Since Hogan gave notice to AMCO of the February default, Hogan asserts the district court erred by not holding AMCO responsible for the costs of supplementing Eiden's work to cure the June default.

[¶117] Hogan did not make this argument to the district court. The district court ordered the parties to submit written closing arguments. The court specifically directed Hogan to provide argument about its claims against AMCO, including "the item[s] of damages . . . incurred after the surety received reasonable notice[.]" In its initial closing argument, Hogan briefly discussed its theory that AMCO was responsible for Eiden's defaults. Hogan said it "sent the February [13], 2017[,] and August 10, 2017[,] notices to AMCO," but "AMCO made no attempt to remedy Eiden's defaults or arrange for substitute performance" so "the [c]ourt must hold AMCO liable under the [b]ond for Eiden's breach" of the Subcontract. Hogan said nothing about AMCO being responsible for the June breach

35

because Eiden never cured the February 2017 default regarding the late completion of the septic system. Hogan's rebuttal closing argument also did not state its current position that the February 13th notice to cure, which was sent to AMCO, somehow covered the default set out in the June notice, which was not sent to AMCO.

[¶118] The district court rightly stated in its judgment: "Hogan does not offer any legal analysis or legal argument why it is entitled to recover the[] damages [from Eiden's failure to cure the June 2017 default] from AMCO under the terms of the bond." Because Hogan did not present its newly constructed argument to the district court, we decline to consider it. *See In re VS*, ¶ 25, 429 P.3d at 21-22, and *In re ECH*, ¶ 21, 423 P.3d at 302.

### D. The district court correctly calculated prejudgment interest on Hogan's award after offsetting the amount Hogan owed Eiden.

[¶119] In its initial judgment, the district court concluded Hogan's damages were liquidated and calculated the amount due on each category of damages by separately applying prejudgment interest, i.e. Hogan's damages for draining the lagoons included the $240,927 cost of pumping the effluent and hauling it offsite for disposal, plus prejudgment interest, for a total of $314,616; Hogan's damages for renting a tank used as a temporary fire pond included the $8,340 rental fee, plus prejudgment interest, for a total of $10,876.05; Hogan's damages for repairing a filter housing Eiden incorrectly installed in the septic system included the $9,901.02 cost of the repair, plus prejudgment interest, for a total of $12,915.57; and Hogan's damages for retesting Eiden's compaction work included the testing fee of $7,605, plus prejudgment interest, for a total of $9,917.75. Based on these calculations, Hogan's total damages were $348,325.37. The district court then subtracted Eiden's damages of $158,654, which it determined was an unliquidated amount, resulting in an award to Hogan of $189,671.37.

[¶120] Eiden filed a motion to amend or for relief from judgment, claiming the district court erred in calculating Hogan's total damages by adding prejudgment interest to each category of Hogan's damages before offsetting the amount Hogan owed Eiden.[9] The district court agreed it committed an oversight or omission by using an incorrect method to calculate prejudgment interest and, accordingly, amended its judgment. As we stated above, an order on a motion to alter or amend a judgment under Rule 59(e) is reviewed for

---

[9] Eiden also claimed the district court should have offset Hogan's damages by the balance remaining due to Eiden on the Subcontract ($219,101.55) rather than the amount the district court concluded was due to Eiden for the work it actually performed ($158,654). The district court rejected this aspect of Eiden's motion because Eiden "did not argue for the offset it now seeks." Eiden raises this argument again in its response to Hogan's appeal of the district court's amendment to the judgment. We will not address it because Eiden did not separately raise the issue in its opening brief in its appeal in S-24-0003. *Ultra Res., Inc. v. McMurry Energy Co.*, 2004 WY 141, ¶¶ 7-11, 99 P.3d 959, 962-63 (Wyo. 2004) (explaining it is the responsibility of an appellant to specify issues on appeal and those issues not clearly designated in an opening brief are generally deemed waived).

an abuse of discretion, while a Rule 60(a) motion to correct an oversight or omission in a judgment is reviewed de novo. *Am. Collection Sys., Inc.*, ¶ 16, 550 P.3d at 555; *Snyder*, ¶ 13, 495 P.3d at 879.

[¶121] In its amended judgment, the district court took the amount of each category of Hogan's damages, not including prejudgment interest, and added them together for a total principal amount of $266,733.02. From there, the court subtracted the $158,654 due Eiden to arrive at $108,119.02 in net damages due to Hogan and then calculated prejudgment interest on that amount. The revised total damages award to Hogan was $141,199.32, which was approximately $48,000 less than the original award. Hogan claims the district court should not have amended its judgment to change its prejudgment interest calculation.

[¶122] In general, "'[p]rejudgment interest is available if a two-part test is met: (1) the claim must be liquidated, as opposed to unliquidated, meaning it is readily computable via simple mathematics; and (2) the debtor must receive notice of the amount due before interest begins to accumulate." *Fuger v. Wagoner,* 2024 WY 73, ¶ 30, 551 P.3d 1085, 1094 (Wyo. 2024) (quoting *KM Upstream, LLC v. Elkhorn Constr., Inc.*, 2012 WY 79, ¶ 45, 278 P.3d 711, 727 (Wyo. 2012)). There are no issues in this case as to whether the two elements of prejudgment interest were satisfied or whether prejudgment interest should be awarded. Rather, the issue is how prejudgment interest should be calculated in the situation where there are separate categories of damages and an offset.

[¶123] The district court relied on our decision in *Hollon v. McComb,* 636 P.2d 513 (Wyo. 1981), to conclude the total principal amount due Hogan for Eiden's breach of the Subcontract should be offset by the amount due Eiden under the Subcontract before prejudgment interest was calculated on the net amount owed Hogan. In *Hollon,* we considered the question of how prejudgment interest should be calculated on a "liquidated claim where the opposing party ha[s] successfully asserted an unliquidated counterclaim." *Id.* at 517. After reviewing authorities from other jurisdictions, we adopted the rule that "an unliquidated claim should be set off against a liquidated claim prior to the computation of interest . . . in those cases where the claims arise out of the same general transaction." *Id.* (citing *York Plumbing & Heating Co. v. Groussman Inv. Co.,* 443 P.2d 986 (Colo. 1968)); *see also Fuger,* ¶ 35, 551 P.3d at 1095 (prejudgment interest should be awarded "only [on] the net difference between liquidated claims and offsets").

[¶124] Hogan insists *Hollon* is distinguishable because the amounts due both parties in that case related to the same transaction. Arguing against applying the *Hollon* ruling, Hogan claims the district court "should not have applied the offset before calculating prejudgment interest because [its] damages were not for amounts that would have been owed to Eiden under the Subcontract." It argues that, unlike in *Hollon,* "[n]one of [Hogan's] damages represent an offset against Eiden's counterclaim because these damages do not correspond to any work Eiden failed to perform under the Subcontract." Hogan claims the district court should have, therefore, refused to amend it judgment and,

instead, retained its original calculation of prejudgment interest on Hogan's total damages before applying Eiden's offset.

[¶125] Hogan's argument on prejudgment interest contradicts its position on the merits of its claims against Eiden. The largest item of damages awarded to Hogan was for the expedited draining of the lagoons. Hogan claimed Eiden violated its contractual obligation to drain the lagoon after failing to finish the septic system in a timely manner. Hogan's claimed damages were for its costs to supplement Eiden's work under § 8.2 of the Subcontract. As such, they directly corresponded to Eiden's work under the Subcontract. The other three items making up Hogan's total damages, i.e., the cost of renting the tank used as a temporary fire pond; the cost of repairing a filter housing in the septic system; and the cost of retesting Eiden's compaction work, likewise related to Eiden's responsibilities under the Subcontract. Similarly, Eiden's offset was for the work it performed under the Subcontract. There is no question the amounts due both parties related to the same general transaction. *See Hollon,* 636 P.2d at 517.

[¶126] *Hollon* is directly on point and, as the district court determined, requires subtracting Eiden's offset from the total principal amount of Hogan's damages before calculating prejudgment interest. The district court identified the correct rule of law and accurately applied the facts of the case to the rule of law in calculating prejudgment interest. It did not abuse its discretion or commit an error of law in amending the judgment by recalculating prejudgment interest.

## CONCLUSION

[¶127] We affirm the district court's rulings in S-24-0003. The district court properly found Eiden in breach of the Subcontract for refusing to cure its default by draining the lagoons in a timely fashion. The court did not err by requiring Eiden to reimburse Hogan for bills sent by supplemental contractors to the Hogan Utah office because the evidence showed the bills were for work performed on the Farson-Eden K-12 Project and Hogan actually paid the bills.

[¶128] We also affirm the district court's rulings in S-24-0004. Hogan did not prove Eiden breached the Subcontract by failing to commence and continue satisfactory correction of the defaults in Hogan's August 2017 notice to cure. Moreover, Hogan did not establish it was entitled to disregard the notice of default and cure requirements of the Subcontract to obtain relief under "common law" contract principles. Hogan was not entitled to reimbursement from Eiden for the costs of purchasing and installing a fire pond liner because it did not give Eiden notice and the opportunity to fulfill that task. Hogan did not establish AMCO was responsible under the performance bond for any breach of the Subcontract by Eiden. The district court properly amended the judgment to apply the correct rule for calculating prejudgment interest.

[¶129] Affirmed.